Altschuler v. Coburn.

---

MARGUERITE ALTSCHULER v. WILLIAM COBURN, SHERIFF.

FILED JANUARY 16, 1894.     No. 4670.

| 38 | 881 |
| 52 | 178 |
| 54 | 767 |

1. Trial: CROSS-EXAMINATION: FRAUD. A wide latitude will generally be allowed in the cross-examination of witnesses where the issue is fraud, especially of witnesses who are parties to the alleged fraudulent transaction.

2. Replevin: EVIDENCE. Where property in the possession of M. is taken to satisfy an execution against F., declarations of the former in disparagement of his title *held* admissible in an action by A. to recover the property from the sheriff, there being evidence tending to prove a conspiracy between A., F., and M. to

defraud the creditors of F. by investing M. with the apparent title thereof.

3. **Instructions**: BURDEN OF PROOF. It is not error to instruct that the party on whom the burden rests is required to establish his cause of action or defense by a fair preponderance of the evidence.

4. **Review**: HARMLESS ERROR. A judgment will not be reversed on account of errors which are not prejudicial to the complaining party.

5. **Evidence** examined, and *held* to sustain the judgment of the trial court.

ERROR from the district court of Douglas county. Tried below before DOANE, J.

*B. G. Burbank,* for plaintiff in error:

The court erred in giving the following instruction: "The burden of proof in this case is on the plaintiff to show by a preponderance of the testimony her right to the possession of the property in controversy at the commencement of this suit; and unless she has satisfied you, by a fair preponderance of the testimony, of her right to such possession, she cannot recover in this action." It requires the plaintiff to produce before the jury a greater degree of evidence than required by law. (*Search v. Miller,* 9 Neb., 26; *Marx v. Kilpatrick,* 25 Neb., 118.)

*Hall & McCulloch, contra:*

The use of the words "fair preponderance" in the instruction was not error. (*Dunbar v. Briggs,* 18 Neb., 97.)

Transactions between relatives by which creditors are deprived of their just dues should be scrutinized strictly, and the *bona fides* of such transactions clearly established. (*Fisher v. Herron,* 26 Neb., 130; *Bartlett v. Cheesbrough,* 23 Neb., 767; *Plummer v. Rummel,* 26 Neb., 142.)

Transactions between a failing debtor and his relatives are always suspicious. They are to be regarded with strict

scrutiny. They are badges of fraud unless clearly explained. (*First Nat. Bank of Omaha v. Bartlett*, 8 Neb., 319; *Aultman v. Obermeyer*, 6 Neb., 260; *Thompson v. Loenig*, 13 Neb., 386; *Stevens v. Carson*, 30 Neb., 544; *Lipscomb v. Lyon*, 19 Neb., 511; *Hill v. Fouse*, 32 Neb., 638.)

Post, J.

This was an action of replevin in the district court of Douglas county in which the plaintiff in error, Marguerite Altschuler, sought to recover certain personal property, which is thus described: "All the goods and chattels now being contained in the two-story building known as 'No. 623 North Sixteenth Street,' in the city of Omaha, and all the fixtures and other personal property connected with the saloon in said building contained, of the value of $5,000." A trial resulted in a verdict and judgment for the defendant below, whereupon the case was removed to this court by petition in error.

The plaintiff claims to be the owner in her own right of the property in controversy, while the defendant claims, as sheriff of Douglas county, by virtue of a levy to satisfy certain executions against one John A. Freyhan. From the bill of exceptions it appears that for some time prior to September, 1886, Freyhan had been engaged in the saloon business in Omaha. Some time in said month he failed, and is still owing more than $10,000 of debts contracted previous to his failure. In the month of April following, according to the contention of the plaintiff, she opened a saloon in Omaha, with one McGrath as manager, and that the property seized to satisfy the executions against Freyhan consists of the fixtures and a part of the stock of liquors owned by her, while the theory of the defendant is that the saloon in question and the liquors and fixtures therein were, at the time they were taken by him, the property of Freyhan, and that the plaintiff's alleged ownership is a

mere pretense for the purpose of assisting him, Freyhan, to defraud his creditors. The plaintiff, who is Freyhan's sister, resides with her husband at Missouri Valley, Iowa, and does not appear to have visited Omaha at the time she claims to have embarked in the business of saloon-keeping in that city, and if she ever took an active part in the management of the business, that fact is not apparent from the record. On the 16th day of May, 1887, which was about a month subsequent to the opening of the saloon, Freyhan and McGrath entered into an agreement in writing which, so far as material in the controversy, is as follows:

"This agreement, made at Omaha this 16th day of May, 1887, by and between John A. Freyhan, as agent, of Omaha, party of the first part, and S. M. McGrath, of the same place, party of the second part, witnesseth:

"That said party of the second part shall open and conduct in his own name a wholesale and retail liquor and cigar business in said city of Omaha, under the direction of said party of the first part.

"That all of the assets and property used in and about said business, consisting of fixtures, wines, liquors, cigars, etc., and all the moneys, accounts, and other assets arising out of or accruing from or furnished to be used in said business shall belong to, and be and remain the property of, the party of the first part, as agent, as aforesaid, the intention being by this agreement to cover all property now held by said McGrath for said purpose, and all which may hereafter be purchased for or furnished for use in said business and the receipts, issues and profits thereof.

*       *       *       *       *       *       *

"Said party of the second part shall, if directed by said party of the first part, execute to all parties who may have furnished, or may hereafter furnish, property, or stock, or cash for use in said business a note or notes, or obligations therefor, and secure the same by mortgage on the fixtures, stock, and property aforesaid, or any part thereof. And

said party of the second part shall carry on said business at all times as directed by said party of the first part as agent aforesaid.

\*      \*      \*      \*      \*      \*      .\*

"Nothing herein contained shall be ever construed so as to allow the party of the second part to call in question the agency of the party of the first part or the party whom he represents.

"In the event that said party of the second part shall fail to comply with any of the agreements herein contained on his part to be performed, then said party of the first part shall, at his option, be entitled to immediate possession of all the property, fixtures, and assets used in and about said business, and all moneys arising in any manner out of the same, and to the immediate possession of the buildings and premises whereon said business is being conducted, and the business there being carried on and being conducted within or in any manner thereunto appertaining, the possession of this agreement being sufficient authority upon which the party of the first part, his agents or assigns, may demand, enforce, and receive the immediate possession of said premises, property, and business aforesaid. .

"This agreement is made by said party of the first part with said party of the second part as a personal agreement, which said party of the second part shall have no right to assign, transfer, or in any manner dispose of, and an attempt so to do will terminate this contract at the option of the party of the first part.

"Witness our hands the day and year first above written.

"John A. Freyhan.
"S. M. McGrath.

"Witness to signatures :
    "W. J. Martin.
    "Geo. F. Wittum."

It will be observed that the name of Freyhan's alleged principal is not mentioned in the above agreement, nor does

it appear that the identity of the party represented by him was ever disclosed to McGrath. The latter, it is admitted, applied for and received the license in his own name, and by a sign over the door announced that he was proprietor of the saloon. The business continued under his management until some time during the fall of 1887, from which time, until it was closed out by the sheriff in January following, it was conducted by a bartender employed by Freyhan. A fact which should be noted in this connection is that McGrath was not produced as a witness; nor did the plaintiff testify in her own behalf. A written power of attorney was introduced in evidence which appears to have been executed by the plaintiff on the 2d day of April, 1887, in which it is recited that "John A. Freyhan is appointed her lawful attorney with power to sell and convey by good and sufficient deed, with full covenants and warranty, any and all of the real estate now owned by me or may hereafter be purchased by me, hereby giving and granting to my said attorney full power to do and perform every act necessary to be done in the premises as fully as I could do myself if personally present, also giving and granting unto my said attorney, John A. Freyhan, full power and control over every species of personal property which I may now be in possession of, or may hereafter become possessed of, allowing and delegating to him authority to draw checks, make, sign, deliver and execute notes, contracts, and each and every kind of business which I myself could do relative to my own individual property, and that he is hereby empowered to do the same as fully as I myself could do were I personally thereat, hereby ratifying and confirming all that my said attorney shall do by virtue hereof."

It appears that the original stock of liquors, as well as additions thereto, were purchased on credit from Samuel Westheimer, of St. Joseph, Missouri. Referring to the first order Freyhan testifies:

Q. Did Mrs. Altschuler order the goods, or did you?

A. No, sir; Mr. McGrath placed the orders with Mr. New, the agent of Mr. Westheimer, in my presence, and I acted for Mrs. Altschuler.

Q. In guarantying and confirming the payments of accounts, Mr. McGrath did so under your instruction?

A. Yes, sir.

Q. Mrs. Altschuler wasn't present?

A. No, sir.

It does not appear, except from statements rendered September 14 and October 27, that the plaintiff was known to Westheimer, the business with him having been transacted in the name of McGrath. It is admitted that she advanced no money to pay for the liquors previous to the commencement of this action, and that all payments prior thereto were made from receipts of the saloon, but that the sum of $1,100 was paid October 25 from the proceeds of the property taken under the writ of replevin. The testimony of Freyhan is in some respects unsatisfactory and apparently evasive. For instance, he cannot tell positively whether the surety on the replevin bond was procured by the plaintiff or himself. We are not disposed to comment upon the facts above stated. The jury found Freyhan, and not the plaintiff, to be the owner of the property in controversy, and that finding we must accept as conclusive.

2. Exception was taken to the ruling of the court in permitting the defendant to cross-examine Freyhan with respect to the disposition of certain property by him. Counsel for the plaintiff overlooks the fact that the witness named had testified on his direct examination that plaintiff was the owner of the property, and in effect that his transactions with her were in good faith and not fraudulent as to his creditors. But assuming that he did not expressly or by implication assert that such transactions were free from the taint of fraud, we think the facts disclosed by him, giving them the most favorable construction, are of so

suspicious a character as to fully warrant the examination allowed. A wide latitude will generally be allowed in cross-examinations, where the issue is fraud, especially of witnesses who are parties to the alleged fraudulent transaction. (See *Anderson v. Walter*, 34 Mich., 113.)

3. The next assignment is the admission in evidence over the objection of the plaintiff of certain records of the county court, to-wit, the petition, affidavit for attachment, motion to discharge attachment, affidavit for garnishment, and prior execution and return thereof, all in the case of *Groff v. Freyhan*. It should be mentioned that a second execution to satisfy the judgment above named is one of the writs upon which the defendant relies in the action, and the petition therein was properly received in evidence. The other records were received as tending to establish the insolvency of Freyhan, a fact which the jury were authorized to consider in determining the issue of fraud. Whether or not the records were admissible for that purpose we need not now determine, since if the ruling complained of was erroneous, it was error without prejudice, for the reason that Freyhan's insolvency had been conclusively established by his own testimony.

4. Exception was taken to the admission in evidence of the numerical index of deeds to show the record title of the south 20 feet of lot 12, block 80, in South Omaha. That evidence was material upon one proposition only, and which was collateral to the main controversy. The defendant attempted to show by the cross-examination of Freyhan that he (the witness) had indemnified the surety on the replevin bond, Moritz Meyer. The testimony of the witness, while not satisfactory, is to the effect that Meyer was secured by property in South Omaha, which the plaintiff " had given to Westheimer as security." The record introduced shows a conveyance of the property described by the plaintiff to Rachel Robinson by the latter to Samuel Westheimer, and by the last named to Moritz Meyer.

Its admission, if error, was harmless, since it tends to sustain rather than contradict the claim of the plaintiff.

5. The defendant was permitted to prove declarations of McGrath while the latter was acting as manager of the saloon, in substance, that although it was conducted in his name it was owned by Freyhan, who could not carry on the business in his own name for the reason that he was still owing debts contracted previous to his failure. The ground of the objection is that such statements do not relate to any matter within the scope of the authority of McGrath as the representative either of the plaintiff or Freyhan and are not therefore a part of the *res gestæ*. It does not follow, however, that the question presented by this ruling is to be determined by an application of the principles which govern the law of agency. The contention of the defendant has been throughout that Freyhan was engaged with McGrath in a conspiracy to defraud the creditors of the former, in which he was aided and abetted by the plaintiff. It is sufficient to say that there was, in our judgment, evidence tending to sustain that contention, and sufficient as a foundation for the admission of the declaration offered.

6. Exception was taken to the following instruction: " The burden of proof in this case is on the plaintiff to show by a preponderance of the testimony her right to the possession of the property in controversy at the commencement of this suit, and unless she has satisfied you by a fair preponderance of the testimony of her right to such possession, she cannot recover in this action." The criticism of the instruction is directed to the expression "fair preponderance" of the evidence used therein. In support of this exception we are referred by counsel to *Search v. Miller*, 9 Neb., 26, and *Marx v. Kilpatrick*, 25 Neb., 118, in which the expression "clear preponderance of the evidence" is condemned. But in *Dunbar v. Briggs*, 18 Neb., 94, an instruction was approved which required a counter-claim to

be established by a fair preponderance of the evidence. The last case is in point and decisive of the question presented by this exception.    In the opinion of the writer, any attempt to qualify that term by subtle distinctions between *a clear preponderance* and a *fair preponderance* of the evidence is to be deprecated as an unnecessary refinement and tending to confuse rather than enlighten the average mind. "Preponderance" is defined by Webster thus: "An outweighing; superiority of weight." There can be no preponderance while the evidence is evenly balanced, but when the scale inclines toward one side, we know the weight or superiority of evidence is with that party.    Manifestly there can be no such outweighing unless there is both a clear preponderance and a fair preponderance.    As well might we attempt to apply degrees of comparison to the term "equilibrium" by holding the evidence in one case more evenly balanced than in another.    Applicable in this connection is the language used in Stephen's General View of the Criminal Law, p. 262, with reference to the term "reasonable doubt," where it is said that an attempt to give a specific meaning to the word "reasonable" is "trying to count what is not number, and measure what is not space."

7. Lastly, it is argued that the court erred in the giving of the following instruction: "The jury are instructed that conveyances by and transactions between a failing debtor and his relatives are always suspicious and to be regarded with strict scrutiny, and such transactions are badges of fraud, unless clearly explained."    It is not claimed that the instruction does not correctly state the law as an abstract proposition, but it is contended that it is not applicable to the facts disclosed by the evidence.    To that proposition we cannot give our assent.    Transactions like those shown between the plaintiff and Freyhan are regarded with suspicion and are universally held to be evidence of fraud. We find no prejudicial error in the record and the judgment is accordingly

AFFIRMED.