BONNETT, Respondent, vs. VALLIER, Factory Inspector, and others, Appellants.

*May 18—June 5, 1908.*

CONSTITUTIONAL LAW: POLICE POWER: REGULATION OF TENEMENT HOUSES, ETC.  (1) *Who may challenge validity of statute.* (2) *Injunction against state officials.* (3) *Unconstitutional enactment a nullity.* (4, 5) *Duty of courts: Doubts resolved in favor of validity.* (6–10) *Extent of police power: Judicial and legislative questions: "Reasonableness."* (11–18) *Tenement and lodging houses: Construction and maintenance: Unreasonable requirements: Differences in localities: Official approval of plans: Width of street courts: Light, equipment, etc.: Equal protection of the laws: Penalties preventing resort to courts.* (19) *Ideal and practical regulation.* (20) *When statute wholly void.*

1. A person specially injuriously affected by enforcement of an unconstitutional law may in judicial proceedings challenge the validity thereof.

2. An action against state officials to enjoin them from enforcing an unconstitutional legislative enactment is not an action against the state. In such circumstances the law, so called, affords such state officers no protection. They are judicially regarded as acting in their personal capacities only.

3. An unconstitutional legislative enactment, though law in form, is in fact not law at all. "It confers no rights; it imposes no duties; it affords no protection; . . . it is in legal contemplation as inoperative as though it had never been passed."

4. A court, upon its jurisdiction being properly invoked for the purpose, is in duty bound to test a legislative enactment by all constitutional limitations bearing thereon and condemn it if it be found illegitimate and thus uphold the constitution as superior to legislative will.

5. In testing a legislative enactment as regards its constitutionality, all reasonable doubts must be resolved in favor of legislative power.

6. Legislative authority in the field of police power, the same as in any other, is fenced about on all sides by constitutional limitations. It cannot properly extend beyond such reasonable interferences as tend to preserve and promote the enjoyment, generally, of those "unalienable rights" with which all men are endowed and to secure which "governments are instituted

among men." When it goes beyond that it enters the field of the destructive and so offends against some constitutional limitation.

7. What constitutes a proper subject for regulation under the police power is a judicial question. Matters of mere expediency in respect thereto are wholly for legislative cognizance. What is reasonable is primarily for legislative judgment, but in the ultimate it is a judicial question. There must be reasonable ground, having regard for the public welfare, for the interference, and the means adopted to accomplish the purpose in view must be reasonably necessary.

8. What is reasonable in any given case being a matter resting in human judgment and difficult of ascertainment, in all doubtful cases judicial authority must defer to legislative wisdom, but where the interference is plainly excessive the duty of the court to repel the encroachment is absolute.

9. What is reasonable is not necessarily what is best but what is fairly appropriate to the purpose, under all the circumstances. The scope of the term "reasonable" as regards any situation must be measured having regard to the fundamental principles of human liberty as understood at the time of the formation of the constitution, adapting the same to modern conditions.

10. In determining what is reasonable the court must look to the language of the statute and the facts which appear because of judicial knowledge thereof or otherwise.

11. The construction and maintenance of tenement, lodging, and boarding houses is a proper subject for legislative regulation, but the degree of regulation permissible varies greatly according to circumstances.

12. A police regulation in the field mentioned in the last foregoing paragraph which is not excessive as to a large city might be held unreasonable if applied to the state at large.

13. Limitations in the field suggested impossible or impracticable to comply with, either because of absence of facilities necessary therefor or expense so great as to render the regulation prohibitive in many situations, are unreasonable.

14. A general police regulation down to minute particulars of the construction and maintenance of tenement houses, rendering it impracticable to safely comply therewith in the absence of any official approval of plans and specifications in advance, and containing no provision for such approval, is unreasonable.

15. Where the penal feature of a police regulation is so severe, having regard to the nature of the regulation, as to efficiently intimidate property owners from using their property at all for tenements or lodging-house purposes and from resorting to the

courts for redress or defense as to their honestly supposed rights, it is highly unreasonable. It is a defiance of the equal protection of the laws rendering the act void irrespective of whether its provisions would otherwise be valid.

16. To penalize good-faith resistance to the enforcement of a law by judicial interference is unreasonable and indefensible from any point of view. It denies the equal protection of the laws; it violates the constitutional guaranty to every person of a certain remedy in the law for all injuries to person and property, and violates every principle of civil liberty.

17. A law regarding the construction of tenement houses requiring street courts to be six feet in width between the lot line and the opposite wall of the building—that is, under all conditions and in all localities to be at least six feet wide,—is an unreasonable interference.

18. A police regulation making every habitation regardless of locality a boarding or lodging house in case the proprietor allows a person not a member of his family to have a sleeping room in the house, and regulates the maintenance of the house as regards light, location of beds, equipment with water-closets, etc., is an unreasonable interference.

19. There is a wide interval between the ideal and the practical. The latter standard should prevail as to legislative regulaitons as to the construction and maintenance of tenement, lodging, and boarding houses. Common sense as to what is reasonable in such matters should prevail, not the extreme views of well-meaning persons, as to what is for the best.

20. Where parts of a law viewed by themselves are unconstitutional and other parts so viewed are not, the former may be condemned and the latter upheld if the two are separable, otherwise not. In case the act as a whole has one or more invalid features pervading the entire act it must be regarded as an entirety and all be condemned as unconstitutional.

[Syllabus by MARSHALL, J.]

APPEAL from an order of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Affirmed.*

Action by a property owner specially affected by ch. 269, Laws of 1907, against public officers required by the terms of such chapter to enforce its provisions, to restrain them from doing so by interfering with the plaintiff in the construction of a building upon a lot owned by him in the city of Milwaukee.

The complaint sets forth facts sufficient to entitle plaintiff to the relief prayed for if the law referred to is unconstitutional. Among others these things are substantially stated: Plaintiff entered into a contract in writing with a construction company for the building of a four-story flat building upon a lot owned by him in the city of Milwaukee, Wisconsin, having a frontage of fifty feet on one of the streets of said city and a depth of one hundred and fifty feet. The plans for the building were duly approved by the building inspector of said city before the contract was let and they complied in all respects with ch. 269, Laws of 1907, except as to street courts. The plans call for a building forty-four feet wide, except the rear portion for a length of twenty-two and one-half feet, which is fifty feet wide. For a distance of seventy-two feet from the street on each side of the building there is to be an open space known as a street court three feet wide, open from the ground to the sky, whilst the law aforesaid required said courts to be six feet wide. The courts as planned satisfy all reasonable necessities. To require them to be six feet wide would be unreasonable, would render his plans for the building useless, his lot unsuitable for such a building, and irreparably damage him. Defendants, unless enjoined by the court, in case the construction company proceeds with the building as planned will cause plaintiff or his agents, or the officers, agents, and employees of the company to be arrested, his permit to construct the building will be revoked, and he will be prevented from going on with the work as planned. Said law is so unreasonable as to be unconstitutional and void. It applies to all towns, cities, and villages of the state, whereas it is impracticable to comply with it in the absence of a sewer system and system of water supply. There are many such cities, villages, and towns where it would be impossible to equip a building as required by the law. Plaintiff and all those who may act in his behalf in the construction of a building upon

his lot as planned are menaced with arrest and prosecution under said law for each and every day they persist in the work. Plaintiff has no adequate remedy at law for the injuries to him threatened as aforesaid.

An interim injunction was granted restraining defendants from doing the things pending the action which the same was instituted to permanently restrain, a bond for $250 being given.

The defendants demurred to the complaint for insufficiency and the demurrer was overruled. Defendants appealed from the order generally. It covered the ruling as to the demurrer and the one regarding the temporary injunction.

The defendants entered a motion in this court to dismiss the action upon the ground of its being an action against the state and to dissolve the temporary injunction and for a temporary injunction restraining the plaintiff and all persons acting for him from proceeding with the construction of the building mentioned in the complaint pending the action.

For the appellants there was a brief by the *Attorney General* and *A. C. Titus,* first assistant attorney general, and oral argument by *Mr. Titus.* They contended, *inter alia:* (1) The action seeks to enjoin the enforcement of the criminal laws of the state, and therefore cannot be maintained. It is a general rule that a court of equity will not lend its aid to prevent an illegal act nor to enjoin the enforcement of criminal laws. 1 High, Injunctions (4th ed.) §§ 20, 68; *Tyler v. Hamersley,* 44 Conn. 419; *Holderstaffe v. Saunders,* 6 Mod. 16; *Tiede v. Schneidt,* 99 Wis. 201, 214; *Hemsley v. Myers,* 45 Fed. 283; *Gault v. Wallis,* 53 Ga. 675; *Yates v. Batavia,* 79 Ill. 500; *Creighton v. Dahner,* 70 Miss. 602; *Davis v. Society, etc.* 16 Abb. Pr. N. s. 73; *Kramer v. Board of Police,* 21 Jones & Sp. (53 N. Y. Super.) 492; *Balogh v. Lyman,* 6 App. Div. 271; *Kenny v. Martin,* 11 Misc. Rep. 651; *M. Golden & Co. v. Guthrie,* 3 Okl. 128, 41

Pac. 350; *Burnett v. Craig,* 30 Ala. 135; *Poyer v. Desplaines,* 123 Ill. 111; *Skakel v. Roche,* 27 Ill. App. 423. The only exceptions to this general rule are in certain cases where property rights are being destroyed or are threatened with destruction or with being taken away, as in the case of *Schlitz B. Co. v. Superior,* 117 Wis. 297; or where the plaintiff in the injunction action is being subjected to repeated or unreasonable prosecutions or actions, as in *Wallack v. Society, etc.* 67 N. Y. 23; *Shunkle v. Covington,* 83 Ky. 420; *Milwaukee E. R. & L. Co. v. Bradley,* 108 Wis. 467. Some cases hold that prosecutions for criminal offenses may be restrained when the statute under which such prosecutions are brought is alleged to be unconstitutional. *M. Schandler B. Co. v. Welch,* 42 Fed. 561; *Ex parte Young,* 209 U. S. 123. Other cases hold to the contrary. *Burnett v. Craig,* 30 Ala. 135; *Skakel v. Roche,* 27 Ill. App. 423; *S. Cohen & Co. v. Comm'rs,* 77 N. C. 2. (2) The action, though in form against individuals, is in fact an action against the state, and consequently cannot be maintained without the consent of the state. It is elementary that the state cannot be sued except as the legislature shall provide by law therefor. Const. art. IV, sec. 27; *C., M. & St. P. R. Co. v. State,* 53 Wis. 509; *Houston v. State,* 98 Wis. 481, and cases cited; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563; *Taylor v. Hall,* 71 Tex. 206, 213. Such immunity of the state from suit may not be avoided by indirection. 26 Am. & Eng. Ency. of Law (2d ed.) 488, 490. A suit to restrain the attorney general of the state from enforcing a penal statute is a suit against the state. *Union T. Co. v. Stearns,* 119 Fed. 790; *Cotting v. Kansas City S. Y. Co.* 183 U. S. 79; *Rhodes & J. Mfg. Co. v. New Hampshire,* 70 Fed. 721; *W. U. Tel. Co. v. Myatt,* 98 Fed. 335. This statute is penal and offenders against it may be punished as for a misdemeanor, and this court has held that "the administration of the criminal laws is a state affair, and the offi-

Bonnett v. Vallier, 136 Wis. 193.

cers engaged in such duties represent the sovereign power of the state." *Northern T. Co. v. Snyder,* 113 Wis. 516, 538; *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 579. (3) The complaint is defective because it does not allege or show that plaintiff will suffer irreparable injury if an injunction be not granted. (4) The act in question, ch. 269, Laws of 1907, is valid. *Health Dept. v. Rector, etc.* 145 N. Y. 32, 49; Prentice, Police Powers, 253–255, 260, and cases cited; 3 Birdseye, R. S. of N. Y. 3622 *et seq.;* 4 id. (Supp.) 931 *et seq.; People ex rel. Kemp v. D'Oench,* 11 N. Y. 359; *New York v. Herdje,* 68 App. Div. 370; *Tenement House Dept. v. Moeschen,* 179 N. Y. 325; *Moeschen v. Tenement House Dept.* 203 U. S. 583; *Welch v. Swasey,* 193 Mass. 364, 79 N. E. 745; Freund, Police Power, §§ 127, 128; Tiedeman, Lim. of Police Power, § 122e; *Knoxville v. Bird,* 12 Lea, 121, 47 Am. Rep. 326; *Willy v. Mulledy,* 78 N. Y. 310, 314; *In re Wilshire,* 103 Fed. 620; *State v. Robb,* 100 Me. 180, 185, 186.

For the respondent there was a brief by *Rose, Witte & Rose,* and oral argument by *D. S. Rose.*

A brief was also filed by *Edward W. Frost* on behalf of the Children's Betterment League of Milwaukee.

MARSHALL, J. The complaint shows that respondent would be specially injuriously affected by enforcement of ch. 269, Laws of 1907. Therefore we will regard as the sole matter submitted for consideration that of whether such law is unconstitutional.

That it is competent under the police power by legislative enactments to regulate the construction and maintenance of tenement and lodging houses to some extent, and that legislative activity in that field within all proper limits is commendable, are not open to serious controversy. In some situations such regulations are imperative in the interest of public safety and public health. The court approaches the

consideration of the law in question fully appreciating, it is thought, the worthy motives of those within and those without the legislature to whose efforts the legislation is attributable. Good intentions in the passage of a law or a praiseworthy end sought to be attained thereby cannot save the enactment if it transcends, in the judgment of the court, the limitations which the constitution has placed upon legislative power. In such cases the law, so called, is not a law at all. As has been aptly said:

"It confers no rights; it imposes no duties; it affords no protection; . . . it is, in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby Co.* 118 U. S. 425, 442, 6 Sup. Ct. 1125.

The appeal is often made to courts directly or indirectly to look favorably upon a law because of the worthy purpose in the minds of the promoters in securing its place upon the statute books. That cannot go to the extent of causing hesitancy or failure to condemn a legislative act which clearly exceeds the lawmaking power. Courts have their duty to perform in a case like this and, however unpleasant it may be, they cannot turn aside on any account whatever, even in the face of manifestly the very best of intentions upon the part of the lawmakers and promoters. The greatest constitutional lawyer of our country during its early history aptly said:

"Good intentions will always be pleaded for every assumption of power, but they cannot justify it. The constitution was made to guard the people against the dangers of good intentions. When bad intentions are boldly avowed the people will promptly take care of themselves. They will always be asked why they should resist or question the exercise of power which is so fair in its object, so plausible and patriotic in appearance, and which has the public good alone confessedly in view. Human beings, we may be assured, will generally exercise power when they get it, and they will exercise it most undoubtedly under a popular gov-

-ernment under the pretense of public safety or high public interest. . . . They think there need be little restraint upon themselves." ·

Again they sometimes, it seems, lose sight of the fact that there are such restraints, and so it becomes necessary for the courts in the performance of their constitutional duty to call that to mind. The fathers foresaw that in writing into the constitution those significant words:

"The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles." Sec. 22, art. I, Const. Wis.

The general principles by which the constitutionality of such a law as the one in question must be determined have been so often, so recently, and so fully discussed here that it is useless to go over the ground again at this time. It is sufficient to refer to the following: *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098; *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 91 N. W. 115; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 107 N. W. 500; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137.

The general effects of the authorities are these: An act of the legislature is to be sustained unless it violates some constitutional limitation beyond reasonable question. Such limitations exist by implication as well as by express prohibition. A police regulation must not extend beyond that reasonable interference which tends to preserve and promote enjoyment, generally, of those "unalienable rights" with which "all men are endowed" and to secure which "governments are instituted among men," and must not violate any express prohibition or requirement of the state or national constitution. When it goes beyond the scope indicated and enters into the dominion of the destructive, it is illegitimate and offends against some constitutional restraint, express or implied, and though law in form, it is, as before said, not

law at all, and whether an act purporting to be within the field of police power is reasonable or not, in the ultimate, is a judicial question. There must be reasonable ground for the police interference and also the means adopted must be reasonably necessary for the accomplishment of the purpose in view. So in all cases where the interference affects property and goes beyond what is reasonable by way of interfering with private rights, it offends against the general equality clause of the constitution; it offends against the spirit of the whole instrument; it offends against the prohibitions against taking property without due process of law, and against taking private property for public use without first rendering just compensation therefor.

We pass over, as already indicated, as not open to fair controversy the question of whether the subject dealt with by the law before us is one proper for legislative interference under the police power. So we come at once to the secondary question of judicial cognizance of whether the manner of interference is reasonable.

"Small limitations," it is said, "of previously existing rights incident to property may be imposed for the sake of preventing a manifest evil," while "larger ones could not be, except by the exercise of the right of eminent domain." *Rideout v. Knox,* 148 Mass. 368, 372, 19 N. E. 390, 392; *Sawyer v. Davis,* 136 Mass. 239, 242. Note the significant words "small limitations." What constitutes such limitations must necessarily be determined with reference to the exigencies of the particular situation. So actual destruction of private property under the police power in some cases is proper, while very little interference in others might be held improper. *State v. Redmon, supra.* There is no certain test by which what is reasonable in any given case can be definitely measured. It is a matter resting in human judgment. So the line between what is reasonable and what is not, marking the boundary of constitutional authority of the

legislature, is one often difficult of ascertainment, rendering it very necessary, in all doubtful cases, for the judiciary to defer to the wisdom of the legislature. But when the boundary has been plainly passed, the duty of the court to repel the encroachment and so uphold the constitution is absolute. It has no discretion in the matter. *Marbury v. Madison,* 1 Cranch, 137.

It is said "that an attempt to give a specific meaning to the word 'reasonable' is 'trying to count what is not number, and measure what is not space.'" *Altschuler v. Coburn,* 38 Neb. 881, 890, 57 N. W. 836, 838. It is not synonymous with "expediency." Matters of that sort are wholly for legislative cognizance. As applied to means to a legitimate end it suggests not necessarily the best or the only method, but one fairly appropriate at least under all the circumstances. In the ultimate, the scope of the term as regards any situation must be measured having regard to the fundamental principles of human liberty, as they were understood at the time of the formation of the constitution and were intended to be impregnably entrenched thereby, adapting the same, of course, to our modern conditions. Those principles have not changed in the years that have elapsed since the constitution was formed. They are unchangeable and are of no less but rather of greater importance than they were when the framers of the constitution attempted so carefully to guard them.

"Reasonable," as applied to a law, is manifestly not what extremists upon the one side or the other would deem, in the light of the principles referred to and the situation to be dealt with, fit or fair. It is what "from the calm sea level," so to speak, of common sense, applied to the whole situation, is not illegitimate in view of the end to be attained. In determining that, the court must look to the language of the statute and to all the facts bearing on the situation of which it may properly be said to judicially know because of their

common nature or otherwise. *People ex rel. Kemmler v. Durston,* 119 N. Y. 569, 24 N. E. 6; *Schollenberger v. Pennsylvania,* 171 U. S. 1, 8, 18 Sup. Ct. 757.

It must be conceded that the degree of regulation of the construction, maintenance, and manner of occupancy of tenement houses and lodging houses which is reasonable must vary greatly according to density of population and other circumstances. What would be reasonable in a very large city might be highly unreasonable in the country or in the small cities and villages of the state. Requirements as to large structures to be occupied by many persons might be very unreasonable as to the smaller class of the same general class of structures to be occupied by very few persons. Again, requirements as to water service and fire hazard, not difficult to comply with by moderate expense in cities where there is a water and sewer system which are essential to the equipment of buildings in those respects, might be plainly reasonable, while such requirements in country districts and the smaller cities and villages where there are no such facilities, might be just as plainly absurd. The character of the structure and its equipment, as regards the expense required to comply with the law in a large city, where the added cost is warranted, not only by the degree of danger to be guarded against but by the returns a proprietor could reasonably expect to derive from his investment, might be within the boundaries of reason, while the same requirements as to sparsely settled districts and in small cities and villages, where the conditions as to such dangers and the expense that could prudently be incurred in erecting the structure are entirely different, might be plainly outside the boundaries of reason. In *Tenement House Dept. v. Moeschen,* 179 N. Y. 325, 335, 72 N. E. 231, the court observed that an act of the nature of the one under consideration "necessary for the city of New York, might not have the slightest application to Albany or

Buffalo," and in *Health Dept. v. Rector, etc.* 145 N. Y. 32, 41, 39 N. E. 833, 836, that

"no one would contend that the amount of the expenditure which an act of this kind may cause, . . . is within the absolute discretion of the legislature. It cannot be claimed that it would have the right, even under the exercise of the police power, to command the doing of some act by the owner of property and for the purpose of carrying out some provision of law, which act could only be performed by the expenditure of a large and unreasonable amount of money on the part of the owner. If such excessive demand were made the act would without doubt violate the constitutional rights of the individual. The exaction must not alone be reasonable when compared with the amount of the work or the character of the improvement demanded. The improvement or work must in itself be reasonable, proper and fair exaction when considered with reference to the object to be attained. If the expense to the individual under such circumstances would amount to a very large and unreasonable sum, that fact would be a most material one in deciding whether the method or means adopted for the attainment of the main object were or were not an unreasonable demand upon the individual for the benefit of the public. Of this the courts must, within proper limits, be the judges."

Turning to the law in question, in the light of the foregoing, the most striking general feature which challenges our attention is that it applies to every part of the state, country districts, small cities, and villages—every portion is subject to the same degree of regulation as the city of Milwaukee, notwithstanding the obvious fact, as suggested in effect in the New York case above cited, that the conditions calling for such interference are so widely different that it would seem need for classification would have occurred to the legislative mind at once, in dealing with the matter, especially in view of the requirements which are entirely unsuitable to locations where water and sewer systems do not exist, and the calls for an expensive grade of buildings common to

large cities, but.which no prudent man would seriously think of .erecting in some situations unless he could afford and designed to devote his means to charitable uses.

We find the law framed after the manner of the one in New York specially designed for the great city of New York and said by the New York court, as indicated, that it might be entirely unsuitable for even such cities as Albany and Buffalo, with many new features added to the model and many of those presented in such model much more severe, and then the whole applied to every part of the state.

To illustrate what has been said we will refer to a few of the most prominent features of the law.

Subd. 2, sec. 1636—162, Stats. (Laws of 1907, ch. 269), containing the requirement specially complained of, calls for lot-line courts reaching from the street, when permissible at all, to be at least six feet wide for all buildings four stories or less in height. So even for a small two-story structure to be occupied by two families, anywhere in the state, it must not be so placed that in case of a street court the width will be less than six feet. No such severe provision is found in any law of the kind anywhere else, even in the case where it is restrained in its effect to the largest city in the United States. We have no hesitancy in saying that the interference as to this matter, considering its general nature, is unreasonable. Whether it would in all respects bear the constitutional test, even as to large cities, as regards small two-story structures to be occupied by two families only, and a large class of houses that fall under the designation of lodging or boarding houses, especially in the outskirts of such cities, is not entirely free from doubt. We might well add, it is clearly on the border line, if not across it, of what is reasonable. We do not need to go further at this point and will not do so, but leave the matter for legislative consideration in the future with such caution as what has been said may afford.

Sec. 1636—169 requires every tenement house down to the most insignificant of such structures anywhere in the state to be equipped with substantially all the ordinary modern conveniences as to water supply common to cities where there is a public sewer system and public water system. That, it seems, no one taking a common sense view of the matter can considerately claim is reasonable. It is impracticable in the extreme, impossible would probably not be too strong a term to use, to comply with such requirements in many, even most, portions of the state. The result is that, except within a very limited area, the construction and enjoyment of even the most insignificant kind of tenement houses is, in effect, prohibited by the law. It is not likely that the promoters of the legislation, or the legislature, deliberately intended any such result. Presumably their minds were so engrossed with the importance of such regulations as to large cities, and possibly only to the largest city of this state, that the effect of the law upon the rest of the state was overlooked. Manifestly, the provision is highly unreasonable in the general sense, and whether in some of the particulars it does not go too far even for special localities is not entirely free from doubt.

The law contains specific requirements down to the minutest details as to the construction of stair halls and their accessories and fire-escapes, and, not content with the result of following such minute specifications, the legislature added a requirement that the stairs must have at least a carrying capacity, with a factor of safety of four, of seventy-five pounds per square foot when loaded over the entire area. Sec. 1636—153. That is to say, by the terms of the law, though a person constructs his stairs in all respects according to the precise specifications thereof, regardless of the size of the building or its location, if they do not possess the required carrying capacity, he and all concerned with him are subject

to be treated as criminals and to suffer the severe penalties prescribed.

There are particular requirements as to the method of construction to be followed too numerous to mention,—in the whole, such as to enhance the probable expense of building a tenement house to such an extent as to practically prohibit the construction of any outside of cities of the first or second importance.    It is to be noted that in the New York model, which was apparently the guide and which applies, as indicated, only to the city of New York, a special exception from many provisions of the law was made for wooden tenement houses, not exceeding two stories in height, to be occupied by not more than four families and erected outside of prescribed fire limits.    The act in question contains no saving clause at all for the protection of parties desiring to erect modest two-story tenement houses anywhere in the state.    In that respect the act must be regarded, as to some situations at least, as practically taking property without due process of law and taking it for public use without rendering just compensation therefor, in violation of the constitutional provisions on those subjects, and violative of other constitutional restraints not necessary to mention.    Whether these regulations are not, in many features, too severe even for the larger cities may well be the subject for study in case of a further effort to legislate in respect to the matter.

A further general feature of the law which arrests our attention is this: It is so particular and technical in its requirements that an ordinary person would not be reasonably safe in entering upon the work of constructing such a building as it deals with without the assistance of an expert architect to make the plans and specifications and even details, expert mechanics to execute the scheme, with the architect to supervise such execution, and, perhaps, a competent adviser as to the legal aspects of the matter, and, even then, the builder and all concerned with him in the matter, however

innocent so far as bad intent is concerned they might be, would be in considerable danger of many criminal prosecutions for as many separate violations of law, and being penalized in large sums of money and cast into and confined in jail besides, and yet there is no provision in the act to enable the builder before entering upon the work to obtain a certificate of sufficiency of his plans from some official source, which will protect him in case of a good-faith execution of the scheme. It is a very serious question as to whether that does not render the law unreasonable in the whole, especially since it reaches every part of the state, preventing any one from enjoying the ordinary privilege as heretofore of building a simple inconsequential two-story house for two families, which is commonly erected by the proprietor himself or by the use of ordinary mechanics and without the use of a skilled or perhaps any architect. Absence of such a provision from the act is peculiar to the one in question. There is much reason to suppose it was omitted by oversight. We cannot think it was omitted by design. The New York model covers the subject in a most particular way. Secs. 121 and 122 of the Tenement House Act, 3 Birdseye, Rev. Stats., Codes & Gen. Laws of New York, p. 3638. The same is true of the New Jersey law (sec. 182, ch. 61, Laws of 1904), and likewise of the law of Connecticut (sec. 25, ch. 178, Laws of 1905).

There is another general feature of the act which arrests our attention and that is the penal clause, particularly in view of the recent decision of the federal supreme court, that where a police regulation is sought to be made effective by danger of such punishment for violations thereof and such burdens upon unsuccessful efforts even to test its validity as to intimidate parties affected thereby from resorting to the courts in the matter, as to practically prohibit them from seeking any judicial remedy for supposed wrongs inflicted upon them, it denies to them equal protection of the laws

and renders the whole act void irrespective of whether its provisions would otherwise be valid.

We must view the penal provision in the light of the situation before adverted to, that the act is replete with requirements down to minor details and of a technical character in some respects, relative to buildings of the character dealt with, regardless of locality and in many respects regardless of the character of the structure other than the characteristics of two stories and designed occupancy or occupancy by two or more families, in the whole, as before indicated, not practicable for one to follow without expert advice in preparation and execution and not practicable to follow safely in all respects under those circumstances, and yet there is no provision for official approval of plans and specifications in advance of execution, so the builder and all concerned with him must proceed, if at all, wholly at their peril of having many violations of as many requirements discovered to have occurred, without any bad intent, and after it is too late to remedy the difficulty without serious and perhaps ruinous loss and too late to avoid in any way the severe punishments prescribed.

The penal clause is as follows:

"Sec. 1636—176. Every person who shall violate or assist in violating or who shall fail to comply with any of the provisions of this act or who shall resist the enforcement of any provision of this act shall be guilty of a misdemeanor and upon conviction thereof shall be subject to a fine of not less than ten dollars nor more than two hundred dollars or by imprisonment in the county jail not less than fifteen days nor more than sixty days or by both such fine and imprisonment in the discretion of the court, and for each and every day after the first that such violation shall continue such person shall be subject to a fine of ten dollars in the discretion of the court in addition to that hereinbefore provided."

It will be noted that a person may unintentionally violate some one or any number of provisions and upon demand be-

ing made upon him by the authority charged with the duty of enforcing the law, however much he may think he is not at fault as to any particular matter, he is made guilty of a second offense if he fails to comply, and in case of a prosecution being commenced against him as to any such violation, and, we repeat, there may be many, and there be an entire absence of any bad intent, he will become guilty of a third offense, if he resists prosecution by standing trial, and the situation as to him will apply to all concerned with him, regardless of any intent to disobey the law or to unreasonably resist its enforcement. Further, upon its being determined judicially that any violation has occurred, and we again repeat there might be many, and without bad intent, no time is given to remedy the departure from the law; every day of the continuance will be counted and penalty upon penalty may be imposed till the violation shall be effaced, regardless of the diligence of the guilty person to remedy the wrong, and even regardless, as to many persons that might be guilty, of the possibility of their being competent to remedy the wrong at all. It is thus not difficult to see how under the law a person of moderate means, though acting in the best of good faith and with diligence, might, in the construction of a single building of moderate dimensions, have penalties accumulated against him to an enormous amount and be so menaced by the fact that every failure to comply with the law would add to the load and every instance of an application to the courts by way of attack or defense, regardless of good faith in the matter, would further add thereto, that no one but a man of courage would take the chances of building a structure affected by the act, especially in portions of the state where expert assistance in the matter is either not obtainable at all or obtainable without such expense as to render the act prohibitory.

Except as to the element making mere resistance to the enforcement of the act a separate offense the penal provision

would look somewhat different if a way were provided for official approval of plans and specifications at the outset, affording a reasonable basis for holding the builder guilty at least of negligence, constructive or actual, in case of his failing in execution, though even with the exception and the additional provision the penal feature would not be entirely free from difficulty. As it stands, the feature penalizing mere resistance to the law is clearly unreasonable and indefensible from any point of view. The effect of it would be to take property without due process of law, to violate sec. 9, art. I, of the state constitution guaranteeing to every person a certain remedy in the law for all injuries or wrongs which he may receive in his person, property, or character, and to violate every principle of civil liberty entrenched in the constitution.

We have read and reread the act without success to see if the particular matter under consideration can be reasonably seen to refer to resistance to its enforcement in any other sense than defending against a prosecution commenced under it. If this were the only difficulty with the penal clause it might be condemned without affecting the rest, but, taking the clause as a whole, in view of the general character of the act, combined with the significant absence of any facility for a prospective builder to reasonably protect himself by obtaining in advance of commencing his work an official approval of his plans, it seems that the dangers are so many and so great that an ordinary person would be quite liable to be intimidated into surrendering his right to use his real estate for tenement-house or lodging-house purposes rather than take the chances, or, if he did not make such surrender and proceeded to enjoy such right as circumspectly as practicable, be intimidated into submitting to the demands of those charged with the enforcement of the law and to prosecutions under it, regardless of whether he thought himself innocent or not. This feature of the act pervades and con-

demns the whole under the doctrine of *Ex parte Young,* 209 U. S. 123, 28 Sup. Ct. 441.

There are other features of the law which arrest our attention, but whether they are excessive interferences or not need not necessarily be decided, though we feel warranted in saying that if it were required to pass upon them the questions involved would be extremely difficult to solve in favor of the act. We will refer to a few of such features. There is a provision preventing the owner of a corner lot from using for his building more than eighty per cent. of the area, and of any other lot from using over sixty-five per cent.; a provision prohibiting transoms or movable sash and requiring in nonfireproof buildings in the stair halls fireproof self-closing doors and fixed iron sash filled with wire glass; a provision requiring, in the absence of a special permit to the contrary, all rooms to be whitewashed at least twice every year in particularly specified months; a provision prohibiting a person from permitting another not a member of his family to have the use of a room in his house for sleeping purposes without such house being classed as a lodging house and subjected to numerous and somewhat petty requirements as to such places, including the keeping of "a proper light" burning in the common hallway near the stairs upon the first and second floors from sunset to sunrise every night throughout the year and upon all other floors until ten o'clock in the evening unless officially otherwise directed. The extreme nature of that interference can only be appreciated by keeping in mind that it applies to every portion of the state and to every habitation where the proprietor allows even one person, not a member of his family, to have a sleeping apartment therein. Further, in this connection, it should be noted that every lodging house is required to have at least one water-closet. That, of course, means a water-closet such as is commonly constructed in dwelling houses in localities where there are water and sewer facilities rendering it prac-

ticable.   So a person in any part of the state is prohibited
from allowing another not a member of his family to have
a sleeping apartment in his house unless the habitation is
equipped with a water-closet.   Further, there is an arbitrary
requirement for rooms generally to be at least nine feet high
in the clear,—that to apply, of course, to lodging houses as
well as tenement houses; and the unusual height of rooms,
as will be seen, is not to be restricted to the extent of the or-
dinary finish in such unpretentious buildings as are com-
monly constructed in the country and small communities.
We note in this connection that the law the act was modeled
after does not contain such severe provisions.   The further
provision should not be overlooked (sec. 1636—173), pre-
scribing particularly how beds shall be located in a bedroom
and requiring, generally, under all conditions, a person hav-
ing a tenement or lodging house to consult and conform to
such a petty requirement as that in case of his allowing two
beds in a room they shall be so located as to have at least two
feet on each side and receive direct light from windows un-
obstructed, such requirement to extend to any case where a
person allows another not a member of his family to have a
sleeping apartment in his house.   How any one could expect
that such a petty interference with individual rights could
be squared with common sense in the light of a rational idea
of the principles of civil liberty is not perceived.   What
good reason is there in classing every habitation regardless
of character or locality, if at all, as a lodging or boarding
house and to minutely, if at all, regulate its use, merely be-
cause of the proprietor or lessee permitting a person not a
member of his family to have a sleeping apartment therein?
We cannot imagine any.

   There are other provisions that might be referred to which
are worthy of some attention, especially in view of the gen-
eral character of the act.   Sufficient, however, has been said
to indicate that it cannot stand and that in case of a further

effort to legislate in the same field the particular features condemned should be avoided and others should be studied with care; appreciating that lawmaking power is quite closely fenced about by wise limitations and must proceed, in the field of police regulation, reasonably at every step. Common sense as to reasonable requirements and reasonable means of securing such requirements should prevail, not the extreme views of well-meaning persons as to what is for the best. Idealists will often find efforts to force their standards of living upon people generally by legislation barred by constitutional limitations. An eminent author aptly said: "There is a wide interval between the ideal and the practical." If what is here said were not so, individual rights as to persons and property would be only such as sovereign power, acting through the legislature, might see fit to recognize, the inalienable rights commonly supposed to be sacred and inviolable would be changed into mere uncertain privileges, and regulation, so called, might easily become destructive of that which we have been wont to believe was essential to life, liberty, and the pursuit of happiness. It must be appreciated that "small limitations" as to the enjoyment of property, having regard to the nature of the case, measures the scope of police interference. Beyond that lies the broad field where the individual is sovereign so that it cannot be entered at all for private purposes, and as said in *Rideout v. Knox,* 148 Mass. 368, 19 N. E. 390, not for public purposes except by the power of eminent domain.

We may well point the last foregoing by quoting from *Ex parte Jentzsch,* 112 Cal. 468, 472, 44 Pac. 803, 804, this language:

"The spirit of a system such as ours is, therefore, at total variance with that which, more or less veiled, still shows in the paternalism of other nations. . . . We give to the individual the utmost possible amount of personal liberty, and, with that guaranteed him, he is treated as a person of re-

sponsible judgment, not as a child in his nonage, and is left free to work out his destiny. . . . So while the police power is one whose proper use makes most potently for good, in its undefined scope and inordinate exercise lurks no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds affords a temptation to the legislature to encroach upon the rights of citizens with experimental laws, none the less dangerous because well meant. . . . It is sought to uphold the law because 'it is a police regulation.' It is argued that 'the people have passed the law; let not the courts interfere with it. If the people are dissatisfied they may amend or repeal it.' "

We were favored with a similar argument in this case, but such arguments, of course, are of no avail.

In closing we should say we have examined with care all authorities and laws of a somewhat similar character to the one under consideration, cited to our attention, and extended our researches much further. It does not seem necessary to refer to such laws and authorities in detail. We have found nothing elsewhere out of harmony with the principles laid down in this opinion, and if it were otherwise it would not necessarily change the situation. No law similar to the one here, in many of the features, has been passed upon in the whole by any court, as regards its constitutionality. Particular features as to particular situations have been upheld in accord with principles here recognized, though expressions are found in some legal opinions not really necessary to the decisions reached rather more extreme than could meet with our unqualified approval.

From what has been said, the rule as to preserving parts of a law and condemning other parts where the latter are unconstitutional and are separable from the former does not apply to this case. There are several invalid features of the act, each of which pervades the whole, and, therefore, lamentable though it is that a manifestly laudable legislative purpose to promote the public welfare should wholly fail, all

portions of the act must be regarded as an entirety and share a common fate of being condemned as unconstitutional.

What has been said renders it unnecessary to discuss the motion made on behalf of appellants to dissolve the injunction granted by the circuit court and for an injunction and for a dismissal of the appeal. The act the appellants, representing the state, were enjoined temporarily and sought to be enjoined permanently from enforcing, being unconstitutional, the action must be regarded as against them in their individual capacities and not against the state. *Ex parte Young,* 209 U. S. 123, 28 Sup. Ct. 441. The motion, therefore, in all respects must fail for that reason and others indicated in the opinion.

*By the Court.*—The motion above referred to is in all respects denied with $10 costs. The order overruling the demurrer to the complaint and restraining the defendants pending the action is in all respects affirmed.