## No. 11,549.

## DALRYMPLE, MINE INSPECTOR *v.* SEVCIK.

Decided November 29, 1926.

Action to enjoin mine inspector from interfering with operation of a coal mine. Judgment for plaintiff.

## *Reversed.*

1. MINES AND MINING—*Coal—Regulatory Laws.* The object and purpose of coal mining statutes under consideration, are to secure the health and safety of persons engaged in underground coal mining.

2.     *Coal—Police Power.* Legislation safe-guarding coal mining operations is within the scope of the police power of the state.

3.     *Coal—Police Power—Constitutional Law.* Existing statutes regulating coal mining operations considered and held a legitimate exercise of the police power of the state, and not repugnant to the Fourteenth Amendment to the Constitution.

4.     *Coal—Statutes—Individual Owner and Operator.* Whether certain enumerated sections of the coal mining laws are valid as applied to small mines operated and worked by the owner alone, mentioned, but not decided.

*Error to the District Court of El Paso County, Hon. Arthur Cornforth, Judge.*

Mr. WILLIAM L. BOATRIGHT, Attorney General, Mr. JEAN S. BREITENSTEIN, Assistant, for plaintiff in error.

Mr. FRED N. BENTALL, Mr. CLYDE L. STARRETT, for defendant in error.

*En banc.*

MR. JUSTICE SHEAFOR delivered the opinion of the court.

DEFENDANT in error, as plaintiff, brought this suit against plaintiff in error, as defendant, and the parties will be referred to here as in the trial court. Trial to the court, judgment for plaintiff, and defendant brings error.

At the times herein mentioned, plaintiff owned a ten-acre tract of land, hilly, rocky and uncultivated, possessing but small value except for a vein of lignite coal which was worked by plaintiff by means of 22 per cent slopes, running a distance of about 100 feet from the surface to the bottom of the slopes, and at the bottom a drift starts on the level at one slope and runs to the other. At the top the distance from the mouth of one slope to the mouth of the other is about 75 feet, and at the bottom, where they are connected by the drift, the distance is about 300 feet. The plaintiff testified that at the bottom of the slopes, where the work of mining was being done, "there is an entrance from one slope to the other so that one could start underground at one slope and come up through the other." Through these two slopes and the drift the air circulates, but defendant had no ventilating fan on the property and had no certified foreman. The mine was a small one from which was mined from three to six tons of coal per day in the winter, for which plaintiff received $5 per ton.

It appears that the mine was generally operated by plaintiff alone, but on the day the mine was closed, January 23, 1926, plaintiff had one man employed underground working with him, who had been there working during the months of November and December, and to the day of closing.

Plaintiff testified that there was splendid air through the slopes, and that mostly in the winter time the air came in the lower slope and went out the higher one; that there was plenty of air circulation without a fan; said that he could not install a fan or employ a foreman and continue to operate, although he had never figured up how much it would cost him to install a fan and employ a certified man, and that since the 23rd of January he had no one working with him in the mine; that there was no gas in his mine, nor anything else that would be dangerous to one working there; that his mine was well timbered and had been regularly inspected every three months by the coal mine inspector.

The defendant testified that in his opinion a mine, such as the one in question, operating without a fan and without a certified foreman, is dangerous to men working therein; that it was because of that danger he closed the mine, but he also said, in answer to the question why he closed the mine just at that time, "Well, the reason was that through my leniency the little fellow was allowed to operate since 1913, in many instances without either fan or inspector; we have threatened by correspondence and also by word of mouth, but when we went to close them down the humane element entered into it and they would not close down; but the number of small mines increased to such an extent, and competition on account of that has become so keen that they have allowed us no other method of handling the situation. * * * Whenever they cut the price of coal to the consumer to such an extent as they have done, it is impossible to allow them to operate without complying with the law." He further said, when asked why he closed the mine, "because the air and circulation was unreliable, and because there was no certified man in charge of the operation." He also said that there was not any more evidence of danger in this mine on January 23, than in the ordinary mine; that there is danger in all of them; none of them are safe; that

there was no specific danger in this mine the morning he was there. It further appeared from defendant's testimony that sometimes non-gaseous mines become gaseous mines almost instantaneously, and that they had had two explosions in mines of that kind; that in the last thirty days they had had two explosions, seven lives being lost, both being in mines where gas had never been detected; that the explosions were caused by the accumulation of explosive gases; that those were in bituminous fields, but they had some lignite fields that were also gaseous. Further that any mine that has fire in is gaseous and that that gas is more dangerous than what is termed the regular mine gas. The inspector said that he had been in the plaintiff's mine only once, early in the morning, and there was a good current of air going through. In answer to a question as to whether or not he knew there was ever any stagnation in plaintiff's mine, defendant answered that he knew it was impossible for a mine to be ventilated so there is not stagnant air; that there was sufficient air at the time he was there so that a man could work with ordinary safety; that none of them are safe. Defendant also testified that a fan would cost about $200, and that if plaintiff could pass the examination, he could be his own certified foreman; that there was no question in his mind that plaintiff was competent if he wanted to take the examination.

The purpose of this suit was to enjoin and restrain defendant from requiring plaintiff to place a certified person in charge of the mine, and from requiring him to install a fan, and also from interfering with plaintiff in his operation of the mine.

Plaintiff's contentions are that existing laws are not applicable to him and his property; that the present statute is an unreasonable exercise of the police power of the state; and that it violates section 25, article II of the Constitution of Colorado, and the Fourteenth Amendment to the Constitution of the United States, in that it de-

prives the plaintiff of his property, and the use thereof, without due process of law.

The sections of the statute involved are as follows: Section 3558, C. L. 1921, as amended by section 24, chapter 134, Session Laws, 1925; section 3482, C. L. 1921, as amended by section 16, chapter 134, Session Laws, 1925; section 3481, C. L. 1921, and section 3567, C. L. 1921, as amended by section 25, chapter 134, Session Laws, 1925.

Section 2, article XVI of the Constitution, reads: "The general assembly shall provide by law for the proper ventilation of mines, the construction of escapement shafts, and such other appliances as may be necessary to protect the health and secure the safety of the workmen therein;   *   *   *."

Section 3558, C. L. 1921, as amended, reads: "The owner of every coal mine, whether operated by means of shaft, slope, or drift, shall provide and maintain pure air in said mine, and as a means to that end shall cause to be circulated throughout said mine, by fan from the outside of said mine pure air in an amount of not less than one hundred cubic feet per minute for each person therein employed,   *   *   *   which air shall be distributed and circulated by the 'split system' in such manner as to dilute, render harmless, and expel the poisonous and noxious gases from each and every working place in said mine.  All other means of removing gases from coal mines are hereby prohibited."

Section 3482, as amended, provides in part as follows: "In order to secure efficient management and proper ventilation of the mines, to promote the health and safety of the persons employed therein and to protect and preserve the property connected therewith, the owner shall employ a competent and practical mine foreman for every mine.  The mine foreman shall have full charge of all the inside workings and of all persons employed therein, in order that all the provisions of this act so far as they relate to his duties, shall be complied with, and

the regulations prescribed for each class of workmen under his charge shall be carried out in the strictest manner possible.''

Section 3481, C. L. 1921, provides, in substance, that when any owner so operates a coal mine that, through the violation of any provisions of the act, in the opinion of the deputy inspector of that district, there is imminent danger to the lives or health of the miners or employees, such deputy inspector shall notify the person in charge of the mine to immediately remove the dangerous condition, and in case of his failure or refusal to comply the deputy inspector shall have full power to order the mine or the dangerous portion cleared of all persons other than those he deems actually necessary and competent to remove and care for the dangerous condition; that on closing any mine the deputy inspector shall notify the chief inspector and the chief inspector shall make a personal examination, in company with two deputy inspectors, and if he shall deem it necessary, shall have authority to place a competent person at the mine, and further provides that the owner shall have the right to apply to the district court for a writ of injunction to enjoin the mine inspector from continuing to prevent the operation of a mine, and that thereupon the court or judge shall at once proceed to hear and determine the case, and shall either sustain or overrule the action of the inspector.

Section 3567, as amended provides, among other things, that ''in all operating mines fans shall be kept running continuously day and night unless by permission of the chief inspector of coal mines.''

On or about September 26, 1925, the defendant, who was then state inspector of coal mines, notified plaintiff that he must at once employ a certified foreman to be in charge of the mine, and also that he must install a ventilating fan. The plaintiff, neglecting or refusing to comply with the demand, defendant and his deputies, on or about January 23, 1926, declared the mine dangerous,

closed it, and threatened to keep the same closed until the requirements of the inspectors should be complied with.

Of course, the object and purpose of the statutes are to secure the health and safety of persons engaged in underground coal mining, as specified in section 3482, supra.

The mine in question was not closed because of it being then in a dangerous condition, but because it might become so and for other reasons stated in defendant's testimony. The statutes apply to every mine, large or small, and to every mine owner, whether operating alone or with the assistance of others, and if the statutes are valid, the inspectors should see that they are enforced. The real question then presented for our determination is the validity of the sections of the statutes quoted, i. e., whether the statute is an unreasonable exercise of the police power of the state. Coal mining is known to be a most hazardous and dangerous business, an occupation requiring the strictest supervision for the safety of the mine worker. The law makes no distinction between the large mine and the small one.

How far can the state go in the exercise of its police power and that exercise be not deemed unreasonable? As suggested in *Commonwealth v. Bonnell*, 8 Phila. (Pa.) 534, if the state can police the towns and cities within its borders, why may it not police the coal mines? The statute, having for its object the preservation of the health and lives of men working in a business so hazardous and so fraught with peril, should not be held unconstitutional unless it clearly is so. We think it is generally recognized that such legislation is within the scope of the police power of the state. 18 R. C. L. 1232; 27 Cyc. 747.

As applied to the coal mining business generally, we have no hesitation in saying that the requirements of the statute are reasonable and necessary, and a proper exercise of the legislative function.

The plaintiff insists that as applied to him and his mine the requirements are unreasonable and therefore, as to him and his property, the statutes are invalid.

Plaintiff testified that the man who was working underground with him at the time the mine was closed was employed by him because "the inspector every time he comes around said it was pretty dangerous. I ought to have a man working with me and I told him I couldn't hardly afford it." And that it was under the inspector's advice that he put the man in. Notwithstanding the employee may have been placed in the mine because of the suggestion of the inspector, his employment was voluntary. It therefore appears that at the time the mine was closed it was being operated by the owner with one employee assisting him in the underground work of mining.

According to the evidence, an explosion from gas is as likely to occur in a small mine as in a large one; where one man works or where many are employed.

We think the statute in question is a legitimate exercise of the police power, as applied to the facts here, and is not inconsistent with the Fourteenth Amendment to the Federal Constitution; also that plaintiff is not, by the statute, deprived of any right or privilege conferred by that amendment; neither is he deprived of his property without due process of law.

In *Powell v. Pennsylvania,* 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253, the court held that the Fourteenth Amendment was not designed to interfere with the exercise of the police power, citing *Mugler v. Kansas,* 123 U. S. 663, 8 Sup. Ct. 273, 31 L. Ed. 205.

In *Murphy v. California,* 225 U. S. 623, 32 Sup. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153, the holding of the court was, that while the Fourteenth Amendment protects the citizen in his right to engage in a lawful business, "it does not prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious or offensive to the

public.  *  *  *  and the regulation or prohibition need not be postponed until the evil has become flagrant."

The plaintiff has cited to us and requests us to particularly examine *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885, and *State v. Redmon,* 134 Wis. 89, 114 N. W. 137, which we have done.

The facts in the foregoing cases were so vitally different from the facts in the instant case that they can have no controlling influence here, and they do not disprove the proposition that the law in question is a proper exercise of the police power.

We wish to make it plain that we are not passing upon the validity of the statute as applied to a small mine operated and worked by the owner alone. We are holding the statute valid, as applied to the facts in the case here, where, as we have pointed out, the mine when closed and for nearly three months prior to that date was being worked by the owner and one employee.

The judgment should be reversed.  Reversed.