## LAMBERT v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   August 7, 1922.)

No. 3803.

1. **Searches and seizures** ⊜⟶7—**Not unreasonable, where person's actions justify belief that liquor is being unlawfully transported.**

There was no violation of Const. Amend. 4, prohibiting unreasonable search or seizure without a warrant, where the actions of one whose automobile on the street is seized and searched for liquor by prohibition officers justify them in believing that he is at the time transporting liquor in violation of National Prohibition Act.

2. **Arrest** ⊜⟶63(4)—**Intoxicating liquors** ⊜⟶250—**Belief that liquor was being unlawfully transported, justifying arrest and seizure, warranted by defendant's acts.**

Defendant's actions, as disclosed by the evidence, *held* such as to warrant the prohibition officers in believing that he was at the time transporting liquor in violation of the National Prohibition Act, justifying them in arresting him and seizing and searching his automobile.

In Error to the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

M. Lambert was convicted of violation of the National Prohibition Act, and he brings error.   Affirmed.

M. B. Moore, of Reno, Nev., for plaintiff in error.

William Woodburn, U. S. Atty., and M. A. Diskin, Asst. U. S. Atty., both of Reno, Nev.

Before ROSS, MORROW, and HUNT, Circuit Judges.

ROSS, Circuit Judge.   The plaintiff in error contends that he was convicted and sentenced to pay a fine of $500 upon evidence improperly admitted against him in violation of the provisions of the Fourth and Fifth Amendments of the Constitution of the United States; he having objected to such evidence and excepted to the rulings of the court admitting it.   The charge against him was, in substance, that he unlawfully and knowingly transported 16½ bottles of intoxicating liquor containing one-half of 1 per cent. or more of alcohol by volume, fit for use for beverage purposes, in an automobile in and on the streets of Reno, Nev., and there having the same in his possession.

It appears from the record that the National Prohibition Director of the District of Nevada, J. P. Donnelley, and another federal officer connected with the enforcement of prohibition in that district, Jonathan Payne, had their attention called to the automobile by a man named Edison, whose testimony was introduced in the case, and upon whose information Donnelley and Payne acted in going to the automobile without any search warrant and without any warrant for the arrest of the plaintiff in error—the automobile at the time having been parked by the plaintiff in error opposite the Grand Buffet and Grand Café, two business houses in Reno, and while the plaintiff in error was in one of those places.   Donnelley went to the machine, and, looking in it, found a package covered with a canvas, which afterwards

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

proved to be a box nailed up, and also discovered a quart bottle full of reddish liquid. The two officers then stepped off about 50 feet and waited until the plaintiff in error came over and got into his automobile and started, when they jumped onto the running board, telling him that they were federal officers, and telling him to drive to the police station, which he did.

The witness Edison, upon whose information the officers acted, testified in effect, among other things, that he saw the plaintiff in error, Lambert, before the latter reached Reno, opposite a roadhouse about 30 miles from Reno, and there saw Lambert put a bottle which looked like a quart bottle into his car, which bottle looked as if it had whisky in it, the color being that of whisky; that the car also had a big box in it, and had in it also some old clothes or trash of some kind; that the box was covered up. It appears that upon subsequent examination by the officers the box, as well as the single bottle, was found to contain whisky.

The witness Edison further testified that he took the same road to Reno that Lambert did, and, so far as pertinent to the present inquiry, continued as follows:

"I drove up pretty close behind him, and then he went on and met me again, and I didn't see him again until I got into Reno. I drove right along up beside of his car; his car was parked on Second street. * * * It was just about in front of the Grand, a little up above from the Grand; in front of the Grand Café, or Grand Saloon, it is called. * * * I walked alongside of it and looked in it. * * * I seen the bottle that he put in the car. * * * It looked like it had whisky in it. * * * The color was the color of whisky. * * *

"Q. Where you saw this bottle in the car, was there any covering over that portion of the car? A. Not any more than the car had a big box in it, and had some old clothes, trash of some kind, in it.

"Q. Could you see the box plainly? A. I could the end of it.

"Q. How about the top of the box? A. It was covered up.

"Q. What did you do then, Mr. Edison? A. I went into the saloon.

"Q. What saloon? A. The Grand.

"Q. The Grand Buffet? A. Yes.

"Q. How far away from the Grand Buffet was this car, approximately? A. About as far as across this room, probably 50 feet—40 or 50.

"Q. About 50 feet? A. Somewheres there.

"Q. You have been in the Grand Buffet a number of times? A. Yes.

"Q. What is it, a soft drink parlor? A. A soft drink parlor.

"Q. Did you see the defendant in the Grand Buffet? A. I did.

"Q. At that time? A. I did.

"Q. How long did you remain there? A. Just walked in, and looked around, and went back out again.

"Q. Where did you go then? A. Over to Mr. Donnelley's office.

"Q. Thereafter did you come back to the Grand Buffet? A. I did.

"Q. Did you see the car there at that time? A. The car was gone at that time.

"Q. Then where did you go? A. I took Mr. Payne in my car and drove around the town, looking, trying to locate the car.

"Q. Did you thereafter see the defendant? A. I did after that; yes.

"Q. Where did you see him? A. In the Grand Buffet.

"Q. Was he talking to any one in the Grand Buffet? A. He was.

"Q. Who was he talking to? A. Ed Regan.

"Q. Who is Ed Regan? A. One of the proprietors there, I understand.

"Q. Did you hear any conversation the defendant had with Regan at that time? A. I did.

"Q. What was said? A. I heard Mr. Regan tell him that he could not and would not handle that kind of stuff.

"Q. Was anything said about a price? A. I heard him say he could have it for twenty.

"Q. In response to that Mr. Regan said he could not handle it? A. Mr. Regan said he could not handle that kind of stuff.

"Q. Did you thereafter see the automobile which you have described as occupied by the defendant in front of the Grand Buffet? A. I seen the car after that, but not in front of the Grand Buffet.

"Q. Where did you see it? A. It was over on the other side of the street.

"Q. Did you see Capt. Donnelley and Mr. Payne there? A. I did.

"Q. What did the defendant do, if anything, in reference to this car at that time? A. He got in it and backed it away from the sidewalk, backed it right out in front, and started down the street, and Mr. Donnelley got up on the car and talked to him. I came up on the other side, and Mr. Payne got up on the same side of the car that I was on.

"Q. Where did the car go? A, We rode around with him to the police station."

[1] It is conceded by counsel for the government that the search of one's person, his home, his papers, or other effects, without a valid warrant is illegal, and that evidence so obtained cannot be used in support of a criminal charge against him; but it is insisted that this presents no such case.

Section 26 of title 2 of the National Prohibition Act (41 Stat. 305. 315) declares, among other things:

"When the commissioner, his assistants, inspectors, or any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof. Such officer shall at once proceed against the person arrested under the provisions of this title in any court having competent jurisdiction; but the said vehicle or conveyance shall be returned to the owner upon execution by him or of a good and valid bond, with sufficient sureties, in a sum double the value of the property, which said bond shall be approved by said officer and shall be conditioned to return said property to the custody of said officer on the day of trial to abide the judgment of the court. The court upon conviction of the person so arrested shall order the liquor destroyed, and unless good cause to the contrary is shown by the owner, shall order a sale by public auction of the property seized, and the officer making the sale, after deducting the expenses of keeping the property, the fee for the seizure, and the cost of the sale, shall pay all liens, according to their priorities, which are established, by intervention or otherwise at said hearing or in other proceeding brought for said purpose, as being bona fide and as having been created without the lienor having any notice that the carrying vehicle was being used or was to be used for illegal transportation of liquor, and shall pay the balance of the proceeds into the treasury of the United States as miscellaneous receipts. * * * "

The Fourth and Fifth Amendments to the Constitution are as follows:

"Article IV. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon reasonable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

"Article V. No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, ex-

cept in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

In the late case of Gouled v. United States, 255 U. S. 298, 303, 41 Sup. Ct. 261, 263 (65 L. Ed. 647), the Supreme Court said:

"It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in Boyd v. United States, 116 U. S. 616, in Weeks v. United States, 232 U. S. 383, and in Silverthorne Lumber Co. v. United States, 251 U. S. 385) have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two amendments. The effect of the decisions cited is that such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property,' that they are to be regarded as of the very essence of constitutional liberty, and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen—the right, to trial by jury, to the writ of habeas corpus, and to due process of law. It has been repeatedly decided that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers."

In giving an affirmative answer to the two questions propounded to it in that case, the court further said:

"The prohibition of the Fourth Amendment is against all unreasonable searches and seizures, and if for a government officer to obtain entrance to a man's house or office by force or by an illegal threat or show of force, amounting to coercion, and then to search for and seize his private papers, would be an unreasonable and therefore a prohibited search and seizure, as it certainly would be, it is impossible to successfully contend that a like search and seizure would be a reasonable one if only admission were obtained by stealth, instead of by force or coercion. The security and privacy of the home or office and of the papers of the owner would be as much invaded and the search and seizure would be as much against his will in the one case as in the other, and it must therefore be regarded as equally in violation of his constitutional rights. Without discussing them, we cannot doubt that such decisions as there are in conflict with this conclusion are unsound, and that, whether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence falls within the scope of the prohibition of the Fourth Amendment, and therefore the answer to the first question must be in the affirmative.

"The second question reads: 'Is the admission of such paper in evidence against the same person when indicted for crime a violation of the Fifth Amendment?' Upon authority of the Boyd Case, supra, this second question must also be answered in the affirmative. In practice the result is the same to one accused of crime, whether he be obliged to supply evidence against himself, or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers. In either case he is the unwilling source of the evidence, and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case."

[2] What is prohibited by the Fourth Amendment of the Constitution, as will be seen from the foregoing, is the unreasonable search or seizure of the person, home, papers, or effects of any of the people

of this country without a warrant issued upon reasonable cause, supported by oath or affirmation particularly describing the place to be searched and the person or thing to be seized. It is not claimed that either of the officers who made the search and seizure here involved acted by virtue of any warrant, or that they made any attempt to procure a warrant upon the information conveyed to them by Edison. Under the circumstances of the case, was that essential?

The prohibition of the Fourth Amendment is against all unreasonable searches and seizures. Whether such search or seizure is or is not unreasonable must necesarily be determined according to the facts and circumstances of the particular case. We think the actions of the plaintiff in error in the present case, as disclosed by the testimony of Edison, were of themselves enough to justify the officers in believing that Lambert was at the time actually engaged in the commission of the crime defined and denounced by the National Prohibition Act, and that they were therefore justified in arresting him and in seizing the automobile by means of which he was committing the offense—just as peace officers may lawfully arrest thugs and burglars, when their actions are such as to reasonably lead the officers to believe that they are actually engaged in a criminal act, without giving the criminals time and opportunity to escape while the officers go away to make application for a warrant.

The judgment is affirmed.