### GANCI v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 2, 1923.)

#### No. 85.

1. **Criminal law ⚖︎395—Searches and seizures ⚖︎7—Search without warrant or probable cause unreasonable and unlawful, and articles seized are inadmissible in evidence.**

   A search of defendant's domicile by narcotic agents, without a search warrant and where they had no knowledge of defendant or his premises and no information on which to base an affidavit of probable cause, *held* unreasonable and unlawful, and articles found and seized in such search *held* not admissible in evidence against defendant.

2. **Criminal law ⚖︎696(6)—Motion to exclude material evidence unlawfully procured may be made at any time before verdict.**

   A motion to exclude evidence as having been procured through an unlawful and unconstitutional search and seizure, and which affects substantial rights, may be made, and must be entertained, at any time prior to verdict.

   Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Guiseppe Ganci. Judgment of conviction, and defendant brings error. Reversed.

Writ of error to a judgment entered by the District Court for the Southern District of New York upon the verdict of a jury, finding defendant guilty of two counts of an indictment under the act of December 17, 1914, as amended.

M. Michael Edelstein, of New York City, for plaintiff in error.

William Hayward, U. S. Atty., of New York City (Moses Polakoff, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

MAYER, Circuit Judge. Ganci and one Emanuel Lusco were jointly indicted under sections 1, 2, and 8 of the so-called Harrison Act of December 17, 1914, as amended by the act of February 24, 1919 (Comp. St. Ann. Supp. 1919, § 6287g, and Comp. St. §§ 6287h, 6287n).

The indictment contained six counts. Eliminating indictment language, the charges of the respective counts may be summarized as follows: (1) That defendants sold a quantity of heroin without having registered with the collector of internal revenue and without having paid the tax as provided by law; (2) that defendants sold the heroin without an order therefor upon a form issued by the collector of internal revenue; (3) that defendants sold a quantity of cocaine without having registered and without having paid the tax; (4) that defendants sold and delivered the cocaine without the production and delivery of an order form; (5) that from June 1, 1921, to and including November 3, 1921, defendants "were then and there dealing in" opium, morphine, heroin, and cocaine, "and so were persons required to register and pay the special tax as required by" the act of December 17, 1914, as amended, and that defendants had not registered and had not paid the tax; (6) that from June 1, 1921, to and including November 3, 1921, defendants had unlawfully in their possession heroin, morphine, and cocaine without having registered and without having paid the special tax.

Lusco was convicted under all six counts. Ganci was acquitted on counts 1, 2, 3, and 4 and convicted under counts 5 and 6. The fifth and sixth counts were laid respectively under section 1 and 8 of the act. The pertinent parts of these sections are quoted in the margin.[1]

[1] "Sec. 1. That on or before July 1 of each year every person who imports, manufactures, produces, compounds, sells, deals in, dispenses, or gives away opium or coca leaves, or any compound, manufacture, salt, derivative, or preparation thereof, shall register with the collector of internal revenue of the district his name or style, place of business and place or places where such business is to be carried on, and pay the special taxes hereinafter provided. * * *

"It shall be unlawful for any person required to register under the provisions of this act to import, manufacture, produce, compound, sell, deal in, dispense, distribute, administer or give away any of the aforesaid drugs without having registered and paid the special tax as imposed by this section. * * *

"It shall be unlawful for any person to purchase, sell, dispense, or distribute any of the aforesaid drugs except in the original stamped package or from the original stamped package; and the absence of appropriate tax-paid stamps from any of the aforesaid drugs shall be prima facie evidence of a violation of this section by the person in whose possession same may be found; and the possession of any original stamped package containing any of the aforesaid drugs by any person who has not registered and paid special taxes as required by this section shall be prima facie evidence of liability to such special tax. * * *"

"Sec. 8. That it shall be unlawful for any person not registered under the provisions of this act, and who has not paid the special tax provided for by this act, to have in his possession or under his control any of the aforesaid drugs; and such possession or control shall be presumptive evidence of a violation of this section, and also of a violation of the provisions of section one of this act. * * *"

To establish the offenses charged the government called three witnesses.

[1] Joseph Smith testified that he was a peddler of narcotics, and that about 3 o'clock on the afternoon of November 3, 1921, he was arrested by Manning and Pacetta, agents of the so-called narcotic squad of the Internal Revenue Department. Smith said to Manning:

"Why take me; I am only a little fellow, why don't you get a big fellow? I will give you a big connection if you turn around and give me money to go and buy the stuff."

The "big fellow" was defendant Lusco, from whom, as Smith testified, he had been buying narcotics for seven months twice a week. A plan for the detection of Lusco was then arranged. Smith informed the officers that his former purchases from Lusco usually amounted to about $80—$60 for heroin and $20 for cocaine. Manning gave Smith $80 in marked bills, and the usual protection of searching Smith was taken, so that Smith would have no narcotics on his person, and no money except the marked bills. Lusco lived at 124 Seventh avenue, which was at about Nineteenth street. The office of the narcotic squad was at Twenty-Seventh street, and Smith left there to proceed to Lusco's home with the officers closely following Smith. Smith went into Lusco's apartment and found him in bed, and, according to Smith's testimony, he told Lusco that he needed some narcotics at once, whereupon Lusco started to dress himself and asked Smith how much he wanted. To this Smith answered that he wanted 100 grams, a package of H and C (H for heroin and C for cocaine); but Lusco told Smith that he did not have any C, but that he had H, and Smith stated that he would take the H. Lusco told Smith to meet him downstairs. Smith thereupon went downstairs and went into a baker's shop, and, after he came out, Lusco's wife approached Smith and called him upstairs. When Smith went upstairs on this second occasion, Lusco showed him a very small quantity of cocaine, for which Smith gave Lusco $4 and Lusco then told Smith that the latter had better give him the money for the heroin. Thereupon Smith gave Lusco $60 for the heroin. Smith again went downstairs, and in about 10 minutes was joined by Lusco. These two proceeded through Eighteenth street to Eighth avenue, got on an Eighth avenue car, and went up to Thirty-Fifth street and Eighth avenue. They then walked west until they reached an opera house building between Eighth and Ninth avenues, when Lusco told Smith to wait until he came back. In about half an hour, according to Smith, Lusco returned with a package of heroin.

Manning had followed Lusco to the premises, 419 West Thirty-Fifth street, and these were the premises which Lusco entered and in which he remained, according to Manning, for about 10 or 15 minutes. After Lusco came out of these premises, Manning followed him to the point where Lusco met Smith, saw Lusco hand Smith a newspaper, saw Smith put this in his pocket, thereupon arrested Smith and took the package from him, and Pacetta, another government agent, also then arrested Lusco. The package contained heroin. The testi-

mony of Pacetta accorded substantially with that of Manning in respect of the matters set forth supra.

Both Smith and Lusco were taken to the police station at Thirtieth street, and then Manning went back to his office and was joined by several other government agents. Manning then went with his associates to 419 West Thirty-Fifth street.

It will be noted that up to this time no information of any kind had been given as to Ganci. Smith had said nothing to the officers concerning Ganci.

On the trial Smith testified that, when he visited Lusco on occasions prior to November 3d, he had sometimes seen Ganci present, but had never had any conversations with him. Even this information as to seeing Ganci with Lusco was not communicated by Smith to the officers. The most that can be said is that the officers had reasonable ground to believe that Lusco had obtained the narcotics from some person or place in 419 West Thirty-Fifth street.

Ganci had conducted a barber shop at 419 West Thirty-Fifth street for 16 years, and lived in four rooms in the rear of the shop with his wife and six children. The first room was the dining room, the second, the bedroom of Ganci and a son, the third, the kitchen, and the fourth, the bedroom of his wife and his other children.

After Manning and his associates arrived at 419 West Thirty-Fifth street, he went all through the house, which apparently was a tenement dwelling. He did not go into the barber shop first. His search may best be described in his own words:

"I went to the top floor of the building first and inquired for Emanuel Lusco. I did not search that apartment. Then I went down to the next floor, and there I inquired for Emanuel Lusco, and they told me there they didn't know him. I did not search that apartment. I don't remember whether there were Italian people living on the top floor or on the next to the top floor. Then I went on the next floor below that and made the same inquiry there. We intended to search that apartment, but we did not. I looked under the sink; pulled the curtains from the sink. The man looked to be all right, and I said, 'All right.' That is the only place I looked, under the sink. I didn't expect to find narcotics under the sink; I just looked for them. Then we went down to the candy store. We did not search that place. * * * I had each floor watched; yes. I didn't know Ganci before this, never saw him in my life; never heard of him. * * * I was looking for anybody selling dope. I may have been looking for Ganci. I didn't know him, neither by name nor by sight, before this day. When I got back there, the last place I visited was the barber shop; that is right. When I got into the barber shop, there was nobody there in the barber shop, and I went through the house."

In the second room back of the barber shop Manning found Ganci lying on the bed. Ganci was "the first Italian" Manning found in the building. "The minute you got in there," he was asked, "you grabbed him and said to him where is the stuff?" to which Manning answered, "That is the fact." Ganci said that he did not have the "stuff," and that he did not know what Manning wanted. Thereupon, Manning began to search, and underneath the sofa he found a box or package. This box or package contained narcotics, and the box and contents were marked as exhibits. Thereafter, according to Manning, Ganci said he had been selling this "stuff" for about a year.

Manning further testified that he told Ganci that the officers intended to search the place thoroughly, and that he would tear down the pictures off the wall and everything else unless "he gave me all the stuff that was there." Ganci said that the only thing he had left was some waxpaper boxes and some bottles. These Ganci produced.

Pacetta was present throughout this entry into and search of Ganci's premises, and substantially corroborated the testimony of Manning.

The box found by the officers and the contents thereof made a formidable array of exhibits as follows: Exhibit 4, box; Exhibit 5, a number of small packages of heroin; Exhibit 6, a set of weighing scales; Exhibit 7, three 100 gram packages of heroin; Exhibit 8, two packages of morphine sulphate; Exhibit 9, a can of heroin in powdered form. After these exhibits were marked in evidence, the prosecuting attorney stated:

"And here are some more packages of cocaine and heroin. I will offer the rest, gentlemen, all the little bottles, about four dozen empty jars."

Ganci took the stand, and testified that he had been in the United States for 32 years, had never been charged with any crime, and, as stated supra, had conducted the barber shop for 16 years, and lived in the rear thereof with his wife and children. He denied knowing Lusco, and gave an explanation of the presence of the box and contents, which, if believed, was consistent with innocence. At the time the exhibits were offered and received in evidence no objection nor appropriate motion to exclude was made, but at the conclusion of Ganci's testimony his counsel moved—

"to strike out the testimony of the officer that was given with relation to taking a box out of Ganci's place on the ground that it appears from their evidence and from their testimony that they had no warrant of seizure, that they went into his place of business, to his home, without any warrant of seizure, and that they took out of his place a box which they claim is a box which they produce here now, which is illegal evidence and has no place here."

This motion was denied and exception duly taken. As Lusco and Ganci were tried together, counsel for Lusco then called Lusco's wife and then Lusco, who was the last witness.

In view of the verdict of the jury and the fact that we find no errors, except as set forth infra, recitation of further details is unnecessary. The verdict of not guilty in favor of Ganci in respect of counts 1, 2, 3 and 4 was tantamount to a finding that Ganci had not engaged in any direct sale. In view of the complete absence of any other evidence implicating Ganci, proof of the possession of the narcotics was vital to conviction under the fifth and sixth counts; for section 8 makes possession by a person not registered and who has not paid the special tax presumptive evidence of a violation of section 1 and section 8.

The assignments and amended assignments of error bring up the question as to whether Ganci's rights under the Fourth and Fifth Amendments were violated.

The Fourth Amendment reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or

GANCI V. UNITED STATES 65
(287 F.)

affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Admittedly there was no search warrant, but the question here considered can be well tested by applying the provisions as to a search warrant. Could Manning or Pacetta have particularly described the place to be searched and the person or things to be seized? Obviously not. All they could have presented by oath or affirmation upon an application for a search warrant was that they suspected that somewhere in a building having many apartments there might be some narcotics? They had ground to believe that Lusco obtained his narcotics from somebody in the building, but their conduct in visiting various apartments, and finally visiting Ganci, who was the "first Italian that" * * * Manning "found in the building," perfectly shows that they were on a roving expedition with no knowledge nor even suspicion to justify their entrance into a particular person's home. The officers had never heard of Ganci, they had seen Lusco enter this tenement building, but they had not seen Lusco enter nor leave Ganci's barber shop or living rooms, and, in brief, they had not even the slightest information upon which to predicate "probable cause."

It is, of course, true that in certain circumstances a search warrant is not necessary, and also that the Fourth Amendment does not safeguard against any search or seizure, but only against "unreasonable" searches and seizures.

An illustration of a search which was not unreasonable is found in the recent case of Lambert v. United States (C. C. A.) 282 Fed. 413, a case wholly different from that at bar, because of Lambert's actions made known to the officers prior to search and seizure. The law is succinctly stated at the conclusion of the opinion as follows:

"What is prohibited by the Fourth Amendment of the Constitution, as will be seen from the foregoing, is the unreasonable search or seizure of the person, home, papers, or effects of any of the people of this country without a warrant issued upon reasonable cause, supported by oath or affirmation particularly describing the place to be searched and the person or thing to be seized. It is not claimed that either of the officers who made the search and seizure here involved acted by virtue of any warrant, or that they made any attempt to procure a warrant upon the information conveyed to them by Edison. Under the circumstances of the case, was that essential?

"The prohibition of the Fourth Amendment is against all *unreasonable* searches and seizures. Whether such search or seizure is or is not unreasonable must necessarily be determined *according to the facts and circumstances of the particular case.* We think the actions of the plaintiff in error in the present case, as disclosed by the testimony of Edison, were of themselves enough to justify the officers in believing that Lambert was at the time actually engaged in the commission of the crime defined and denounced by the National Prohibition Act, and that they were therefore justified in arresting him and in seizing the automobile by means of which he was committing the offense, just as peace officers may lawfully arrest thugs and burglars when their actions are such as to reasonably lead the officers to believe that they are actually engaged in a criminal act, without giving the criminals time and opportunity to escape while the officers go away to make application for a warrant." (Italics ours.)

There was nothing in the case at bar to "reasonably lead" Manning and Pacetta to believe that Ganci was "actually engaged in a criminal

287 F.—5

act." If the acts of the officers in entering and searching Ganci's home can be legally justified, no man would be safe from the unreasonable search which the Fourth Amendment denounces.

The Fourth and Fifth Amendments have been so recently considered by the Supreme Court that we need not pause to discuss the previous leading cases. Gouled v. United States, 255 U. S. 298, 41 Sup. Ct. 261, 65 L. Ed. 647; Amos v. United States, 255 U. S. 313, 41 Sup. Ct. 266, 65 L. Ed. 654. The fact that Manning and Pacetta did not use force in entering Ganci's premises adds nothing to the government's case. Gouled v. United States, supra; Amos v. United States, supra.

It is urged, however, that because the narcotics were the instruments of the crime, their seizure was lawful, and the testimony was therefore admissible. It is not, however, unlawful merely to possess narcotics.

The illegal act (among others) consists in possessing without registration and payment of tax, and possession of narcotics is merely presumptive evidence of a violation of the statute. The case is quite different from United States v. Welsh (D. C.) 247 Fed. 239; Id. (C. C. A.) 267 Fed. 819. If, however, upon the facts of this case, there were any doubt that the seized narcotics were not admissible in evidence against Ganci, it is disposed of by the Amos Case, supra, where the court held that it was error to receive in evidence "illicitly distilled" whisky because of the illegal search and seizure.

We must not be tempted to avoid the preservation of constitutional safeguards because of the nature of the crime charged nor because of difficulties in detecting crime. We realize the insidious and dangerous character of the narcotics concerned in this case and appreciate the skill necessary to discover the traffickers. The Supreme Court, however, has never permitted the obnoxious nature of a crime nor the difficulties of detection to dim its view as to the necessity of preserving, at any cost, our hard-won constitutional safeguards, and it may be tritely observed that a stern adherence to that preservation makes both for liberty and order in the long run.

Finally, it is suggested that the motion to strike out came too late.

[2] Whatever, at one time may have been the view as to what constituted a seasonable application to require the government to return seized property or as to what should be regarded as a timely objection, there can now be no doubt that at any time prior to verdict, a motion such as was here made must be entertained. In the Gouled Case the Supreme Court said:

"It is plain that the trial court acted upon the rule, widely adopted, that courts in criminal trials will not pause to determine how the possession of evidence tendered has been obtained. While this is a rule of great practical importance, yet, after all, it is only a rule of procedure, and therefore it is not to be applied as a hard and fast formula to every case, regardless of its special circumstances. We think rather that it is a rule to be used to secure the ends of justice under the circumstances presented by each case, and where, in the progress of a trial, it becomes probable that there has been an unconstitutional seizure of papers, it is the duty of the trial court to entertain an objection to their admission or a motion for their exclusion and to consider

and decide the question as then presented, even where a motion to return the papers may have been denied before trial. A rule of practice must not be allowed for any technical reason to prevail over a constitutional right."

See, also, the Amos Case.

In any event this court will "in the exercise of a sound discretion sometimes notice error in the trial of a criminal case, although the question was not properly raised at the trial by objection and exception" (Crawford v. United States, 212 U. S. at page 194, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392); while, on the other hand, the court will disregard mere technical errors "which do not affect the substantial rights of the parties" (Act Feb. 26, 1919, being chapter 48, amending section 269 of the Judicial Code [Comp. St. Ann. Supp. 1919, § 1246]).

As the search and seizure were illegal, the motion to strike out the testimony relating thereto should have been granted, and failure so to do was reversible error.

Judgment reversed.

HOUGH, Circuit Judge (dissenting). This case raises acutely the question: What is an unreasonable search?

The recent Lambert decision, supra, sufficiently and directly shows that the question exists and is insistent. Its importance cannot be exaggerated, for Congress and Legislatures continually increase the output of statutes intimately regulating private conduct, and making crimes out of indulgence in sensual gratification, which in former yet recent days were left by municipal law to punish their own victims by the physical and moral damnation they admittedly produce. When some men are willing to pay sufficiently high prices for unlawful gratification of desire, other men will of course make a business of pandering to those vices, and such procurers are equally of course professional criminals, a class not engendered by the simple, though severe, criminal codes known when the Constitution of this country was drafted.

When the mere possession of specified articles of commerce becomes per se criminal, the detection and suppression of crime becomes largely discovery and proof of possession, while the criminal invokes the law he professionally violates, by using the citizen's castle—i. e., his home—as the place of possession and the means of criminality. To harmonize the voice of a large class of twentieth century statutes with the voice of an eighteenth century Constitution is indeed difficult.

Again, the Lambert Case, supra, shows indirectly and by the absence of citation the novelty of the question.

The classic comment on the Fourth Amendment, viz. that it is a restatement of the common-law maxim which "secures to the citizen immunity in his home against the prying eyes of the government," except in a "few specified cases" (Cooley Const. Lim. [7th Ed.] p. 425), does not get one very far until the "specified cases" are deliminated with particularity. When it is remembered that Cooley, and all other nineteenth century commentators identify this protection of home with protection "in person, property, and papers," it is difficult to reconcile

such dicta with the proposition (well supported by decisions) that one in custody on a criminal charge "may be subjected to personal search and examination even against his will for evidence of criminality, and such evidence may be constitutionally seized." 35 Cyc. 1271.

The gist of the decisions is that such search and seizure is reasonable, which means that courts, having considered the facts, decree as law on these facts—such reasonableness. This is no more than has always been done by courts in passing on what is, e. g., a reasonable time or the like. First National Bank v. Pipe, etc., Co. (C. C. A.) 273 Fed. 105. If the same or a similar course is pursued here, it seems to me that a more reasonable search cannot be imagined.

The officers of the law saw Lusco deliver unlawful drugs to Smith; they learned from the latter that Lusco was going after a further supply; they saw him go into a tenement and emerge with the supply. It was an irresistible inference that there was a supply in that tenement, and a most natural and probable one that, if there was another Italian in said tenement, he had the supply—i. e., the very crime. They entered the tenement, and the only Italian there was Ganci. They looked under the sofa and found the crime. The entrance was through a barber shop, a public place, there was no breaking, violence, or deception. To me this proceeding was perfectly reasonable,—far more so than the spirit of apparent divination that guided the law officers to the recesses of Lambert's motor, supra.

"Reasonable" means no more than "agreeable to reason," and reason is but "that intellectual power by which we are enabled to combine means for the attainment of particular ends." 3 Bouv. Law Dict. 2818. When applied to searches and seizures, it seems to me quite plain that "reasonable" should have the same signification as when used in other constitutional connections, of which it has been said that—

"The scope of the term as regards any situation must be measured having regard to the fundamental principles of human liberty as they were understood at the time of the formation of the Constitution." Bonnett v. Vallier, 136 Wis. 193, 203, 116 N. W. 885, 888 (17 L. R. A. [N. S.] 486, 128 Am. St. Rep. 1061).

If one considers these facts in this way, it seems almost humorous to suppose that any eighteenth century bailiff would not have done what these officers did, or to suggest that any eighteenth century criminal would have thought his rights invaded.

Indeed, if officers literally in hot pursuit of a crime—i. e., of unlawfully possessed drugs, some of which had been sold under their very noses a few minutes before—may not search and seize before, e. g., a douche of water destroys both crime and evidence, there is no such thing as a reasonable search except by warrant.

Perhaps so, but the amendment does not so declare, and, until by controlling authority this final manacle has been put on crime prevention, I dissent.